Alright, we will next take up Samuels v. Espinoza. Mr. Levine? That's fine, thank you. I'm one of the attorneys who represents the appellant. Before I even get into a discussion, I note for these proceedings that there was one certified claim and about a half a dozen uncertified claims, which were the subjects of some recent supplemental briefings. So I inquire of the court before I begin if there are any or all of these claims you wish me to address this morning or narrow it down to one or two or whatever, and I will oblige. Okay, then I'll start with the certified. Let me just say, obviously the certified claim I would like to hear from you on. I'd also like to hear from you on the Claim 6, which is the uncertified claim about ineffective assistance by trial counsel. Because I think it has some relationship to Claim 5 that was certified. Right, it's one of the many claims of ineffective assistance, but it happens to be one. I'm particularly interested in hearing why you think we should take up Claim 6 in addition to Claim 5, which we have to take up. Okay, that's fine, thank you. Claim 5 is an inadequate or ineffective assistance of counsel claim premised upon a conflict of interest, which I believe the case law has consistently applied to facts such as these in a manner that relief is required here. What you have in the Samuels case is her first attorney suppressed a statement from a co-conspirator, where the co-conspirator told him, in the presence of two other people, that the co-conspirator had committed the murder of Ms. Samuels' husband, but that Ms. Samuels was not involved in the planning, preparation, or anything having to do with that murder. Now, as I said, he made these statements. Counsel, let me ask a question real quick. I've got sticky notes all over the place trying to figure out who's who and where. Can you tell me when representation commenced and ended for both Bernstein and Samuels? Our position is that when both Mr. Bernstein and Ms. Samuels were under investigation by the police department, which started out shortly after the crime had been committed, the first crime had been committed. And I say that, Your Honor, because at one point in the investigation, the police department, believing that the two of them were the suspects, put them in a room together. And unbeknownst to Ms. Samuels and Mr. Bernstein, the police recorded the meeting in the hope of getting some incriminating statements, which they did not. But doesn't your ineffective assistance claim focus on the preliminary hearing? No, it focuses on the entire period of time. Well, but see, there can't be any effect on the case from any conflict that occurred before proceedings commenced. You're not claiming there's some prejudice there. You're claiming that there's a presumption of prejudice because of concurrent representation. Yes. And the only time during the case that there was concurrent representation. Well, there wasn't any time during the case when there was concurrent representation, was there? I think there was. I think what happened, first of all, the preliminary examination, preliminary hearing, followed months after she was charged. So proceedings had commenced against her at some point before the preliminary examination. But from the time that both of them were considered suspects, which was even before that. I understand that everybody agrees there's a time and period in time when Mr. I've got like, like, like Judge Boo, I need a scorecard to keep the name straight. It's like Mr. Roble and represented both Mr. Bernstein and Miss Samuels. That's easy. We all understand that. What you're contending is that there was ineffective assistance of counsel because there was a concurrent representation. And because there was a concurrent representation, you don't have to show prejudice. And what I'm pushing, what I'd like to hear your answer on is at the time that the preliminary hearing took place, which is the time you say, had he only been a good lawyer, he would have introduced all this, all these statements. Mr. Bernstein was dead and Mr. Roblin was no longer representing him. So why doesn't that tell me the effect of that on your claim? OK. First of all, even after that, at that point and after that, Mr. Roblin still considered himself representing. At that point, you'd have to show prejudice. So I'm focusing on that. Why? I don't I don't care what he considered himself. The question is at the hearing, wasn't he only representing her at that point? Well, he he should have taken the position that that was true. But he considered and I think it is relevant that he considered that because if you look at Mickens, one of the things that happened in Mickens was that the attorney said, I no longer represented client number one who had died. But in our case, and if you look at the concurring opinion in Mickens, that was a factor to consider whether or not the the relationship still existed that the attorney even subjectively. Well, counsel, counsel, even so, I think what your real prejudice is. And I want to explore this is that because Roblin had this mistaken assumption that he was still somehow representing Bernstein and he could not use the statement that was exculpatory about Miss Samuels because it was covered by attorney client privilege. And he was wrong about that. She didn't have the benefit of that statement being introduced in her preliminary hearing. Or thereafter or thereafter, because he thereafter the judge said you could admit it. The judge said you could admit that statement at trial. And that's why I wanted to get that claim. The other claim later, trial counsel said, maybe we can, but we don't want to. But they were not prohibited from admitting that statement at trial, were they? They were not prohibited. They made a choice, which was not a reasonable choice. But that's different than the that's different than the notion that she couldn't put it in. I take it at the preliminary hearing. Your argument is she couldn't put it in because her counsel at the time thought it was privileged. And she didn't tell her about it and didn't tell her about it. Right. Anybody about, you know, about the statement and she should have known about the statement. She should have known about it. The authorities should have known about it. The court should have known about it. Everybody should have known about it. And then they could have removed Mr. Roblin and he and she could have had representation where that statement was exploited. That didn't happen. And that's part of the rub here. So what was the prejudice from the preliminary hearing? The outcome of the preliminary hearing was that it would proceed to trial. Right. That she was held to answer for trial. OK, so she's held to answer for trial and the judge says you can put this statement in. There's no impediment to putting this statement in. And then didn't her own subsequent counsel just make the independent determination to use the confession in the trial? I'm sorry, that one I didn't understand. So to Judge Hurwitz's point, wasn't there an independent determination by counsel then not to use the statement? There was, but there were the circumstances under which they made that decision. First of all, they didn't find out about it until the trial was halfway underway. That's number one. They then called Mr. Roblin outside the presence of the jury. Somehow or other, they were able to convince him that his prior positions regarding the relationship with Mr. Bernstein and whether or not these were confidential communications, both of which he was wrong. That those were incorrect positions that he had been taking. Then the trial counsel, the second group, decided as they said in a note sometime later, about several years later, that they felt that if they put that on, it would look like a contrived or concocted defense. So they decided not to put Mr. Roblin on. Which brings us to what Judge Hurwitz asked about in trying to have a discussion about both these claims. And that is that that was also inadequate because it wasn't a reasonable strategy by these defense counsel. How could it look concocted when it had existed years before? Doesn't the Supreme Court tell us that when trial counsel make a strategic decision, it's going to be very difficult for us to find ineffective assistance, even if that decision turns out to be a stupid one? It has to be harder if they make a strategic decision, but it also has to be reasonable. And when you consider the facts and circumstances of this particular scenario, which nobody could make this up. I agree with you on that. Killing the secretary. But in any event. Here's my question on that, though, because it cuts into what you were just saying. Mr. Roblin's got some problems by the time your client gets to trial, no? He does. He had an impeachment problem. I'm not sure whether or not that impeachment was admissible. But I don't know whether it was either. But if I'm trial counsel and I. I hate to put myself in that situation so far removed. Isn't another entitled to say, I'm not sure I want to put this guy out of the stand because that's the way I've got to put on this defense. And he's just may not be a believable guy. I better stick with the other defenses I have, which I think are more believable. Well, that gets us to other claims that are in the supplemental briefing as to whether or not they had other defenses that were believable. In fact, one of the things in one of those claims was that they put on motive evidence of their client having commit having a motive to commit the crime. I don't believe these lawyers made one reasonable decision on a strategic level throughout this trial, whether it was to not object to testimony. Whether it was to put in evidence of her motive or whether it was to not call Mr. Roblin when they had at least a chance of getting Bernstein statement in front of the jury. It would have been a compelling piece of information. And they came up with a different reason that it would have looked like a contrived defense. Well, if they had, that's not reasonable. If they had had the witness testify, I've been holding this information for the last three and a half years because I thought I still had a relationship with Mr. Bernstein. I don't think that that would have been a contrived looking piece of evidence. And one way that it would look contrived is that defendant Samuels actually paid Roblin to represent Bernstein. That may be a factor. That may be a factor. But the point the point was he wasn't representing Bernstein and whether or not she paid money towards that effort because she had money and he didn't. That may be yet another form of breaking a conflict. If a court conducted an inquiry and found out that there was a conflict because client A paid for client B and and the court said, I'm not going to allow this to continue. That didn't happen here. Let me go back one more because I asked you about the commencement and ending of the representation. Because just like judges Wardlaw and Hurwitz, you know, it's a question of Sullivan. Is it consecutive or is it successive? And I am assuming you're saying it's consecutive and concurrent. And your friend on the other side saying just the opposite. What was the period of time that they were concurrently represented? Because Bernstein obviously died. And it's not a question of Roblin's belief. It's a question of what actually occurred. But it is a question of Roblin's belief. That's part of the inquiry. It's not the total part of the inquiry. It's part of the inquiry. If you read Mickens, you can see that the fact that the attorney subjectively believes that he's still representing client number one. That's a factor to consider in terms of setting the parameters of when this relationship existed, whether it was consecutive, whether it was concurrent or successive is the word. But we're dealing here with a habeas. We're in the land and the California Supreme Court issues a postcard denial. So I guess the question phrasing Judge Booth's question a little bit differently is. What clearly established Supreme Court law tells the California Supreme Court that this is a concurrent representation rather than a consecutive one? I think you've got a good argument about why it's concurrent, perhaps. But tell me what case tells them it's concurrent. I believe it's Mickens coupled with Kyle. Mickens involved somebody who died before? Yes. Yes. Right. But the issue there is privilege, is it not? No, the issue was a conflict of interest. And is it? Do they find it's a concurrent representation and therefore prejudice is presumed? No. What they found in Mickens was that it was it was not concurrent because because the attorney in question, the client had been the first clients have been deceased. I know what Mickens held. I apologize for misphrasing my question. Tell me what case says something close to this is a is a concurrent representation. OK, if you have if you read the majority opinion in Mickens coupled with the concurring opinion, you read the two of them together. You'll see that the the basic holding there is that if that the subjective view of the attorney in Mickens killed the claim because he said the client was dead and I did not consider him my client. No, I understand. I'm just trying. Can you point to me a case where the Supreme Court finds concurrent representation where the facts are analogous to this one? I think that if you couple the concurring opinion in Mickens with the majority, but they don't find concurrent representation in Mickens. So I'm asking for a case where they find concurrent representation. OK, I think that that's that's the best. We may not be one. I'm just asking. No, that's the best we can do. But I don't know how you can ignore when you read Mickens. You can ignore the concurring opinion also in the majority opinion where they say that the key factor there was the attorney didn't consider himself to be the attorney for number one anymore. And I'm not sure I understand the Supreme Court's view on clearly established law, but we keep getting slapped around the head and shoulders about it. And that's why I'm asking for a case closely on point. I know the problem. Anyway, the on this concurrent versus versus successive. We have in the situation, our position is that we had an adverse effect and an actual conflict. The adverse effect being the suppression of the state. The actual. That was the question Judge Wardlaw started to ask you. And I think we sidetracked you. It's a preliminary here. There is a ton of evidence. That if believed would suggest this is a triable case. I've never seen a preliminary hearing where somebody came in and said, well, I've got contrary evidence. And the judge said, well, that's good enough for me. I'm not going to I'm not going to bind the person over. Can we really think that it has been introduced? Your client wouldn't have been bound over? Theoretically, yes. And also, they could have taken the statement gone. Theoretically is not is not reasonably probably, which is what what the prejudice prong of Strickland requires. So how is it reasonably probable that had Mr. Roblin testified at the preliminary hearing that Mr. Bernstein told me this, that Miss Samuels would not have been probable cause would not have been found? Well, I'll answer the question by going to prior to the preliminary here. If the attorney had possession of this kind of a statement, then he goes to the district attorney's office or the police department. He says, look, folks, we've got a situation here where I'm prepared to testify at some point that Mr. Bernstein absolved Miss Samuels from this murder. And I think you need to reconsider where we are in this case. But Mr. Roblin didn't do that for whatever reason. And that would have been an effective use of his legal capabilities had he had any. And and would have had a positive impact on Miss Samuels situation. So, you know, I think you can't just I realized this just both is asking for a defined moment in time. But this was a problem that existed over a lengthy period of time, starting with the homicide, continuing on through a lengthy investigation, which took years and continuing on through the preliminary examination and the early part of the trial. After that, the ball got shifted over to the trial counsel to give them an opportunity to do something about this. And I know in response to what Judge Wardlaw asked me, I attempted to show how that was not a reasonable strategy, which under the case law, I think it needs to be. It's not just any strategy. It has to be a reasonable strategy. That was not reasonable. By the end of the trial, what you have is a situation where Miss Samuels never got to present this evidence through no fault of her own. First of all, for most most of the time, she didn't even know about it. So she couldn't have fired her lawyer and gotten another lawyer didn't know about it. Nobody knew about it. When in this timeline did Bernstein die? Sometime prior to the preliminary examination. Prior to the preliminary hearing? No, it was about it was about halfway through the period from the Bernstein murder. Excuse me, from the Samuels murder to the date of the preliminary hearing. So it was so, but he didn't start representing her until the preliminary hearing or was it sometime before that? Did it overlap at all in this? No, he represented them both jointly right from the beginning. Right from the time that they were both suspected. And what can you point to to show that? I don't have the dates at my beck and call here, but I seem to remember that there was when he had the meeting with Mr. Bernstein that he wasn't allowed to testify or didn't want to testify to. It certainly was prior to that. And then the I believe the preliminary hearing was sometime after that. And I'm not sure I'm answering your question, but you continue to represent Miss Samuels from then on and never, never relinquished that. The record's clear he was representing Mr. Bernstein on some other matter. Yes. At the same time that he had Miss Samuels had retained him to represent her in connection with possible charges in this murder, right? That's correct. What does the record tell us about whether he was representing Mr. Bernstein with respect to possible charges in this murder? He testified to that. He said, I considered myself as a lawyer in that investigation. Right. Other than his statement, there's no, I mean, there's no proceedings in which you can make an appearance, obviously. No, there never was. Not with respect to Mr. Bernstein, but he both signed a declaration, which is part of the record. And I believe took that position in his testimony, which was heard outside the jury's presence. Thank you. I would move on to at least one of the other issues. I will give you a minute to address that. I guess it's Claim 17, Uncertified Claim 6. Is that it? Judge Howard, did you want to hear? I think he's already addressed Claim 6. I have addressed Claim 6. What I wanted to address was Claim 3F, which has to do with the introduction of motive evidence by a defense attorney. All right. It was part of the supplemental brief. If you want me to do it now, I'll do it now. If you want me to wait, I'll do it then. Why don't you quickly hit on it? Very, very quickly. In addition to attempting to show how the defense lawyers basically did nothing with respect to character evidence coming in against their client, at several points during the trial, they introduced evidence that the client's daughter was sexually molested by the late Mr. Samuels. They also put on evidence through several witnesses that Ms. Samuels herself was hit or beaten by Mr. Samuels. It started out in the opening statement. It went through the final arguments. It even had an admonition from the court that they were treading upon a very, very dangerous area. But the key thing about this was in attempting to analyze whether or not this was some form of an effective trial strategy, they never argued that any of these facts had anything to do with the innocence of the appellant. They just proved molestation. They just proved bad acts by the victim. And then they stopped. And that's the problem with attempting to look upon this as some kind of a strategy. And I know the Attorney General's office, in their supplemental brief submitted a couple of weeks ago, spent a number of pages coming up with theories how this was a probable strategy. And I just ask the court, as you evaluate those arguments, attempt to look through the opening statement and the final arguments of both the defense and the prosecution and try to find out where that was argued. And with that, I'll submit it unless you have some questions. All right. Thank you, counsel. We'll hear from Mr. Goodman. Good morning, Your Honors. This is Nathan Gutman, Deputy Attorney General for the state, and may it please the court. I'll get right to the timeline because I think Mr. Levine has confused things here. And the timeline is crucial to whether there was concurrent representation. There wasn't. The first murder occurred in December 1988. Bernstein was murdered in late June 1989. The statement to Roebalen, the first attorney, was a few months before that. Obviously, he was alive when he made that statement. And Roebalen represented Samuels before he represented Bernstein. He made clear in his testimony that he only represented Bernstein in the unrelated assault investigation. I'm not sure what Mr. Levine is referring to when he says the opposite. And the crucial date that's been left out of the conversation is when charges were filed. That was in 1990. Charges were filed after Bernstein was killed because Samuels was charged with killing him. He was already out of the picture, and Roebalen was no longer representing Bernstein by the time charges were filed. The California Supreme Court, in its analysis, had no obligation to look at a time other than the time that the Sixth Amendment right to counsel applied. And during that time, there was no concurrent representation. Mickens made clear that the U.S. Supreme Court has never held that successive representation would qualify for a presumption of prejudice. The California Supreme Court was free to require Samuels to prove prejudice. Prejudice is the cleanest way to resolve both the conflict claim and the related, uncertified, ineffective assistance claim. We can say, for the purposes of argument, let's say that this supposed confession from Bernstein came in under the best possible circumstances. The California Supreme Court reasonably could have found that that would not have been credible, and it wouldn't have changed the result, given the California Supreme Court's conclusion on direct appeal that the evidence of guilt was overwhelming. When we're talking about why the confession was not credible, we can look to the content of the confession and the circumstances. The content of the confession is very strange. It is strange in the middle of a spontaneous murder confession also to spontaneously say, oh, and by the way, guess who had nothing to do with this? And in terms of the circumstances of the confession, Bernstein had repeatedly talked about his arrangement with Samuels to many other people. At the time that this statement was supposedly made to Roebalen, at that point Bernstein believed he was the only person who could burn Samuels. He was afraid and he was considering going to the police, and Samuels was in fact trying to hunt him down for that purpose, and she had hired Roebalen to represent Bernstein, arguably to keep tabs on him. Assuming that Bernstein actually made this statement, it's not the pinnacle of credibility that opposing counsel would like to make it out to be. The California Supreme Court reasonably could have found that even if this confession were brought in under the best of circumstances, it would not have changed the result. Turning to the abuse issue, prejudice is again the clearest way to resolve this. We can assume, and by the way, it's not clear exactly what Samuels wishes trial counsel had done on this point, but assuming that trial counsel had totally ignored any additional abuse evidence, and assuming, let's just say, that the prosecutor had never even cross-examined Samuels about this, well that would have just left the defense with unrebutted prosecution evidence that Samuels had repeatedly made these abuse allegations in the course of a long series of murder solicitations. That's not helpful to the defense at all, to have that unrebutted evidence. It was just a situation where there was no good option, based on the prosecution's evidence of Samuels' own statements. If there are no further questions, I would ask the court to affirm the denial of guilt phase relief, and I would submit. Can I ask, this is not relevant to the determination of any legal issues, but the facts in this case, I'm just wondering, where did all the people in this case live and work? What part of California? The people directly involved in this case lived in Los Angeles County. Samuels lived in the Valley. There are assorted other witnesses who I think lived farther away, like some of Bernstein's friends who he made confessions to, but everything that we care about happened in Los Angeles County. Does anybody have any further questions? I guess I'm interested in your response. I don't know which claim it is, but the failure to introduce evidence that Newland Nalline may have killed Samuels. The police actually investigated him. Is that to me? No, that's to Mr. Gutman. Yes, the California Supreme Court reasonably could have rejected that claim based on either Strickland or Prong. That would have been a bad strategy, given that it appeared that Nolan, the ex-police officer, had an alibi in another county, Orange County, on the night we care about. I would also remind the court that there had already been prosecution evidence that Samuels had made an attempted solicitation to an ex-police officer. It would have been a bad idea for the defense to possibly put a name and face to that by calling Nolan an ex-police officer. I just have one other question. The prosecutor goes on TV and says some things. Let's put aside whether or not that's ethical, wise, or otherwise. Does that affect this case at all? No, even taking the statements at face value, I don't think they're the smoking gun that Samuels would argue. She was speaking to a lay audience about the emotional part of trial strategy, about a piece of evidence that was admissible. The fact that she chose to highlight it for emotional purposes, that's just good trial advocacy. I would point out that misconduct claim is defaulted, and Samuels' only argument against that, which has to do with the transcript from that TV show, that has to do with the application of an exception to the Dixon Bar. The application of the state procedural rule isn't a question for this court. That has nothing to do with the exceptions that the court might care about causing prejudice. So that's just red herring. All right. Thank you, Mr. Katman. Mr. Levine, I'll give you a couple more minutes. Thank you. One of the statements I just heard was that Ms. Samuels hired Mr. Roebelin to keep tabs on Mr. Bernstein so that she could hunt him down and somehow or other put him out of the picture. Well, if she had known that he made the statement to Mr. Roebelin that she had nothing to do with this murder, maybe that would have never happened. First of all, it never did, but it certainly couldn't have happened. So I think you need to take that with a grain of salt. One of the members of the court asked where did most of these people live. Mr. Nolan was from Newport Beach. He was the part of Claim 4. And what we did with Mr. Nolan was we attached to the habeas petition as Appendix C a list of about 40 different items of evidence, circumstantial evidence, that may have linked the processing of charges against Mr. Nolan. It was not just motive and opportunity. There was many things that were attributed to him which made him more than a suspect. And he indeed was the major suspect in the case before Ms. Samuels or Mr. Bernstein or anyone else was the suspect. So I think that needed to be discussed. Lastly, the issue regarding whether or not the motive evidence that was introduced by the defense lawyers had any impact upon this trial. I think what the court needs to do is to look at the following portions of the excerpt of record. I'll just give you the page numbers. And hopefully you'll have the opportunity to do this. But look at the opening statement of the defense, which is at the supplemental excerpt of record, page 13, where the defense lawyer says, I'm not really trying to say this was a bad man, but he had a dark side talking about Mr. Samuels. And then he never goes on to say why that would absolve Ms. Samuels of his murder. Then they start to introduce evidence in the case. And the trial judge at the excerpt of record, page 136, says to the defense lawyers, I want to make sure you realize that you are providing the motive for your client to have her husband killed with this question. And then in the final arguments at excerpt of record 254 and 255, the defense lawyers again say, we have proven abuse here, but they never say what it means towards a defense of the case while they were providing motive. And then the piece de resistance is the prosecution's rebuttal at the excerpt of record, page 290, where she said to the jury, they gave me a motive to argue. You take all those excerpts, read them one by one. They're not long. And you'll see why this claim has legs. Thank you. I'm ready to submit unless you have some questions. All right. Does anyone have any further questions? All right. Thank you very much, counsel. Samuels versus Espinoza will be submitted. And this session of the court is adjourned for today. This court for this session stands adjourned.
judges: WARDLAW, HURWITZ, Bough